## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WHITE BUFFALO ENVIRONMENTAL,
INC., an Oklahoma corporation,

       Plaintiff,

vs.                                          No. CIV 21-0175 JB/SCY

HUNGRY HORSE, LLC, a New Mexico
limited liability company; NATALIE
GLADDEN; KATHY RIVERA; HERIBERTO
"EDDIE" GAYTAN, JR.; DAKOATAH
MONTANEZ and LINDSAY SALGADO,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Defendants Hungry Horse, LLC, Natalie

Gladden, Heriberto "Eddie" Gaytan, Jr., Dakoatah Montanez, and Lindsay Salgado's Motion to

Preclude Testimony of Expert Witness Under the *Daubert* Standard, filed September 2, 2022

(Doc. 104)("First Strike Motion"); and (ii) Gladden and Montanez' Second Motion to Strike

Testimony of Jeremy Jennings, filed December 15, 2022 (Doc. 127)("Second Strike Motion").[1]

The Court held a hearing on the First Strike Motion on December 8, 2022, <u>see</u> Clerk's Minutes at

1, filed December 8, 2022 (Doc. 128)("December 8 Clerk's Minutes"), and held a hearing on the

Second Strike Motion on January 17, 2023, <u>see</u> Clerk's Minutes at 1, filed January 17, 2023

(Doc. 135)("January 17 Clerk's Minutes").  The primary issue is whether Plaintiff White Buffalo

Environmental, Inc.'s valuation expert Jeremy C. Jennings, a certified public accountant and

---

[1]The deposition of Jeremy Jennings, Plaintiff White Buffalo Environmental, Inc.'s valuation expert, took place on October 20, 2022, after the First Strike Motion was filed.  The Second Strike Motion was filed pursuant to information obtained during Jennings' deposition. <u>See</u> Clerk's Minutes at 2, filed December 8, 2022 (Doc. 128)("First Hearing Minutes")

business valuation specialist, may testify at trial about White Buffalo's lost business value sustained as a result of the Defendants' alleged actions. The Court concludes that Jennings may testify, because Jennings's report is based on sufficient facts and data, and Jennings applied reliable principles to the facts of this case. Accordingly, the Court will deny the First Strike Motion and the Second Strike Motion.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed September 14, 2020 (Doc. 2). The Court provides these facts for background. The Court does not adopt them as the truth, and it recognizes that the facts are largely White Buffalo's version of events.

White Buffalo is an environmental consulting firm that offers services such as environmental site assessments, spill prevention, control, and countermeasure plans, and regulatory compliance for the oil-and-gas industry. Complaint ¶ 10, at 2. In April 2018, Steve McFarlin, White Buffalo's President, hired Defendant Natalie Gladden as White Buffalo's Environmental Director. See Complaint ¶ 13, at 3. Gladden thereafter successfully earned business from new clients, including Percussion Petroleum Operating, LLC. See Complaint ¶¶ 14-16, at 3. At some point, Gladden formed an agreement with Defendant Hungry Horse, LLC, one of White Buffalo's direct competitors, see Complaint ¶ 34, at 9, through Jerry Brian, a Hungry Horse employee, "to move all or substantially all of the files, customers, and property of White Buffalo to Hungry Horse, and close down the operations of White Buffalo's Hobbs office." Complaint ¶ 17, at 4. White Buffalo's crew supervisor and his crew quit on May 31, 2019, and assumed similar positions with Hungry Horse. See Complaint ¶ 19, at 4. Gladden did not notify McFarlin that the crew supervisor and his crew quit until June 12, 2019. See Complaint ¶ 22, at 5. Further, a bookkeeping candidate informed McFarlin during a job interview that Gladden told her

"that White Buffalo was ceasing operations and moving to Hungry Horse."  Complaint ¶ 29, at 7.
On June 17, 2019, Gladden informed McFarlin that several more employees quit.  See Complaint
¶ 23, at 5.  On June 21, 2019, Gladden informed McFarlin "that she and all remaining employees
were quitting."  Complaint ¶ 30, at 7.  Gladden presented McFarlin with emails from customers
Percussion Petroleum Operating, LLC, Devon Energy Corporation, and Vanguard Natural
Resources that authorized Gladden to take their files with her.  See Complaint ¶ 30, at 7.
Subsequently, McFarlin audited field service tickets, timesheets, payroll, and invoices.  See
Complaint ¶ 32, at 8.  Through this audit, White Buffalo uncovered "evidence of timesheet fraud
and embezzlement, theft of equipment, theft/destruction of soil samples, theft of company files,
and conspiracy to divert business to Hungry Horse."  Complaint ¶ 32, at 8.

## PROCEDURAL BACKGROUND

White Buffalo filed its Complaint on September 14, 2020.  See Complaint at 1.  White
Buffalo brings the following claims against the following Defendants: (i) Count I against Gladden
for breach of fiduciary duty; (ii) Count II against Gladden, and Defendants Heriberto "Eddie"
Gaytan, Jr., Dakoatah Montanez, Lindsey Salgado, and Kathy Rivera, for breach of duty of loyalty;
(iii) Count III against all Defendants for unjust enrichment; (iv) Count IV against all Defendants
for conversion; (v) Count V against Hungry Horse and Gladden for tortious interference with
business relations; and (vi) Count VI against all Defendants for conspiracy.  See Complaint
¶¶ 33-50, at 8-12.  On or about September 3, 2021, Jennings, at White Buffalo's request and for
the purpose of providing "an analysis of the estimated lost profits sustained by Plaintiff as a result
of the alleged wrongful actions of [the Defendants]," submitted the Expert Report of Jeremy C.
Jennings, CPA/ABV (dated September 3, 2021), filed September 2, 2022 (Doc. 104 at
21)("Jennings Report").  Jennings Report at 23.  See First Strike Motion at 1.  On or about April

5, 2022, the Defendants submitted in response the Expert Report of Mike Miller, CPA, CrFA (dated April 5, 2022), filed September 9, 2022 (Doc. 104 at 13)("Miller Report").  First Strike Motion at 2.

### 1.      The First Strike Motion.

On September 2, 2022, Hungry Horse, Gladden, Gaytan, Montanez, and Salgado ("First Strike Motion Defendants") filed the First Strike Motion.  See First Strike Motion at 1. Subsequently, the parties filed a Joint Motion to Reschedule and Extend Trial Setting and Amend Pretrial Deadlines, filed September 13, 2022 (Doc. 107)("Joint Motion"), agreeing to extend deadlines to allow for Jennings' and Miller's depositions.  Joint Motion at 2.  The Court entered an Order, filed September 22, 2022 (Doc. 109), granting the Joint Motion.  See Order at 1.

The First Strike Motion Defendants argue: (i) that Jennings' opinions are not based upon sufficient facts or data, and are not the product of reliable principles or methods; and (ii) that Jennings fails to apply reliably the principles and methods to the case's facts.  See First Strike Motion at 2.  Jennings, in his report, opines that White Buffalo sustained an estimated $2,035,000 loss in business value because of the Defendants' alleged actions.  See Jennings Report at 33. Jennings reached his conclusion by reviewing: (i) White Buffalo's monthly balance sheets from April, 2018, through June, 2019; (ii) White Buffalo's monthly income statements for 2018 and 2019; (iii) White Buffalo's income statements for two twelve-month periods ending December 31, 2018, and December 31, 2019; (iv) White Buffalo's invoice register reports for 2018 and 2019; (v) equipment purchase documents; and (vi) the Complaint.  See Jennings Report at 46.  Jennings

analyzed the facts and data from these documents using the "income approach" to determine the ultimate lost business value.[2]  See Jennings Report at 30-33.

The First Strike Motion Defendants' argument is based on Miller's assessment of Jennings' report.  See First Strike Motion at 4.  More specifically, Miller opines: (i) Jennings has not done independent factual research; (ii) Jennings relies on unaudited financial statements that are marked for management purposes only; (iii) White Buffalo's operation from April, 2018 to June, 2019 is not enough time to reliably predict White Buffalo's future success, and, similarly, Jennings considers only December, 2018 through May, 2019 in his report; (iv) fluctuations in the oil-and-gas market make a reliable valuation of future profits impossible or improbable; (v) White Buffalo's reduction in value is the result of bad management, inadequate capitalization, cash flow shortages, bounced checks, late payroll, dishonored company credit cards, repossessed equipment, and unstable operating environment; and (vi) Jennings' calculations are flawed.  See First Strike Motion at 8-9.  The First Strike Motion Defendants argue, therefore, that Jennings' opinions do not satisfy rule 702 of the Federal Rules of Evidence, and that the Court should exclude Jennings' opinions.  See First Strike Motion at 9.

### 2.    First Strike Motion Response.

White Buffalo first asserts that the Defendants' First Strike Motion is premature, because the First Strike Motion Defendants filed it before Jennings' and Miller's depositions.  See Response to Motion to Preclude Testimony of Expert Witness Under the Daubert Standard at 2-3,

---

[2]The income approach to valuation "measures the future economic benefits that the company can generate for a business owner (or investor).  As part of their analysis, valuation professionals assess factors that determine expected income including data such as revenues, expenses and tax liabilities."  Dean Haave, Business Valuations -- Income Approach, Hanson & Co., https://www.hanson-cpa.com/business-valuations-income-approach/.

filed September 23, 2022 (Doc. 111)("First Strike Motion Response").   Next, White Buffalo argues that Jennings used sufficient facts that find support in: (i) monthly balance sheets; (ii) monthly income statements from April, 2018 through June, 2019; (iii) income statements from December 31, 2018 to December 2019; (iv) invoice register reports for 2018 and for 2019; and (v) equipment purchase documents that indicate which assets White Buffalo owns.  See First Strike Motion Response at 6.   White Buffalo argues further that the financial statements labeled "For Management Purposes Only" contain reliable facts.   First Strike Motion Response at 8.   White Buffalo argues that the statements afford the Defendants an opportunity to cross-examine on the issue, and that the Court should not exclude Jennings' opinions.   See First Strike Motion Response at 8-9.

### 3.   First Strike Motion Reply.

The First Strike Motion Defendants begin their reply by disputing White Buffalo's argument that the First Strike Motion Defendants prematurely filed the First Strike Motion.   See Reply in Support of Motion to Preclude Testimony of Expert Witness Under the *Daubert* Standard at 2, filed October 19, 2022 (Doc. 121)("First Strike Motion Reply").   The First Strike Motion Defendants assert that they filed the First Strike Motion on September 2, 2022, the deadline the Court set previously for the submission of pretrial motions, see Clerk's Minutes at 2, filed April 26, 2022 (Doc. 85), and that Jennings' deposition will provide him an opportunity only to explain his existing opinions, but not to change or supplement them.   See First Strike Motion Reply at 2. Next, the First Strike Motion Defendants clarify their argument that, notwithstanding an expert's ability to rely on hearsay when forming an opinion, Jennings relies on insufficient facts, and assert that Jennings' opinions are not based on reliable principles or methods, and that Jennings has not applied those principles and methods reliably to the case's facts.   See First Strike Motion Reply

at 3.  Further, they rebut White Buffalo's assertion that White Buffalo's operating history's length is irrelevant.  See First Strike Motion Reply at 3.  The First Strike Motion Defendants argue that this assertion is "absurd on its face," and that White Buffalo's fourteen-month operation period is "a relevant matter for both Jennings and Defendants' expert, Mike Miller, to discuss."  First Strike Motion Reply at 3-4.  Moreover, the First Strike Motion Defendants argue that White Buffalo's short operating history, lack of profitability, and cash flow issues indicate that Jennings relies on insufficient data to predict reliably future profitability.  See First Strike Motion Reply at 3-4.

Finally, the First Strike Motion Defendants concede that the Court should not exclude Jennings' testimony strictly because Miller disagrees with his analysis and conclusions.  See First Strike Motion Reply at 4.  The First Strike Motion Defendants then summarize their arguments, i.e., that Jennings' opinions are not reliable, because: "(i) it is simply unreasonable and unreliable to project substantial future profits or value for a company which had a very short period of operations . . . ; and (ii) as shown by Miller, due to numerous errors or false assumptions in Jennings' analysis, his conclusions are unreliable."  First Strike Motion Reply at 4.  The First Strike Motion Defendants concede that "all of these matters will be factual issues for determination by the jury," First Strike Motion Reply at 4, but argue that the Court should exercise its gatekeeping function and preclude Jennings from testifying at trial, see First Strike Motion Reply at 4.

      **4.**    <u>**First Strike Motion Hearing**</u>**.**

The Court held a hearing on the First Strike Motion on December 8, 2022.  See December 8 Clerk's Minutes at 1.  At the hearing, the First Strike Motion Defendants argued that there must be a "sufficient reservoir of relevant facts" for Jennings to formulate a proper opinion, and that no such reservoir exists in this case.  Draft Transcript of Hearing at 8:5-9 (taken Dec. 8,

2011)("December 8 Tr.")(Court).[3]  The First Strike Motion Defendants argued that Jennings could not provide a reliable opinion, because the oil-and-gas industry is unpredictable, and Jennings only used six months of data to form his opinion.  See December 8 Tr. at 7:12-14 (Allison); id. at 8:20-25 (Allison).

White Buffalo responded by characterizing the issue as a "battle of the experts" wherein the experts disagree about the valuation of White Buffalo and the calculation of damages. December 8 Tr. at 14:2-7 (Nixon).  White Buffalo argued that such disagreement constitutes a credibility or weight determination that exceeds the Court's gatekeeping function under Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579 (1993)("Daubert").[4]  See December 8 Tr. at 14:8-10 (Nixon).  Ultimately, the Court agreed with White Buffalo and denied the First Strike Motion.  See December 8 Tr. at 22:24-23:2 (Court).  Before the December 8 hearing on the First Strike Motion concluded, Gladden and Montanez ("Second Strike Motion Defendants") informed the Court they intended to file a second motion seeking to exclude the testimony of Jennings on different grounds. See December 8 Tr. at 27:7-15 (Newell).

---

[3]The Court's citations to the transcript of the December 8 hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[4]In Daubert, the Supreme Court of the United States of America explained the limits that rule 702 places on scientific evidence's admission, noting that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589.  In determining scientific evidence's reliability, trial judges should consider whether the method is tested, whether it has been subject to peer review, what its error rate is, and whether the relevant scientific community embraces its use.  See Daubert, 509 U.S. at 591-594.

5.      **The Second Strike Motion**.

The Second Strike Motion Defendants filed the Second Strike Motion on December 15, 2022.  See Second Strike Motion at 1.  The Second Strike Motion Defendants argue that Jennings' opinion is not reliable, because the information on which he relies is not prepared "in accordance with generally accepted accounting principals [sic] (GAAP) and [is] otherwise devoid of any indicia of reliability."  Second Strike Motion at 1-2.  The Second Strike Motion Defendants assert that generally accepted accounting principles ("GAAP") are designed to promote reliability in the accounting field.  See Second Strike Motion at 2 (citing Deposition of Jeremy Jennings at 146:4-147:10 (taken October 20, 2022), filed December 15, 2022 (Doc. 127-4)("Jennings Depo.")(Jennings)).   The Second Strike Motion Defendants also assert that accounting professionals use GAAP in preparing ledgers, balance sheets, and income statements.  Second Strike Motion at 3 (citing Jennings Depo. at 148:25-149:25)(Jennings)).  According to the Second Strike Motion Defendants, Jennings testified at his deposition that he did not prepare any of the underlying materials which he uses in his reports and that he is unaware whether the materials were prepared in accordance with GAAP.  See Second Strike Motion at 3 (citing Jennings Depo. at 148:25-149:25)(Jennings)).   They assert further that Jennings did not perform forensic or financial analysis on the materials he used in his reports.  See Second Strike Motion at 3 (citing Jennings Depo. 148:25-149:25)(Jennings)).  The Second Strike Motion Defendants argue that Jennings' underlying financial documents are not in compliance with GAAP and that Jennings did not test the reliability of the data.  See Second Strike Motion at 6.  The Second Strike Motion Defendants argue that Jennings made no effort to ensure that the information he uses is accurate.  See Second Strike Motion at 6.

Additionally, the Second Strike Motion Defendants argue that Jennings interpreted "intercompany" to mean "intracompany" and did not attempt to verify the term's proper use in the financial documents.  Second Strike Motion at 6.  The Second Strike Motion Defendants argue that Jennings' misuse of intra vs. inter indicates that he did not vet any information for accuracy. See Second Strike Motion at 6.  Instead, the Second Strike Motion Defendants argue that Jennings simply took inaccurate and incomplete data and accepted it at face value.  See Second Strike Motion at 6.

6.     **Second Strike Motion Response.**

In response, White Buffalo argues that no evidence supports the Second Strike Motion Defendants' argument that Jennings did not rely on GAAP standards.  See White Buffalo Environmental, Inc.'s Response to Second Motion to Strike Testimony of Jeremy Jennings at 4, filed January 9, 2023 (Doc. 131)("Second Strike Motion Response").  White Buffalo contends that GAAP is applicable only when preparing underlying data and not applicable to Jennings' valuation methodology.  See Second Strike Motion Response at 4.  White Buffalo argues that, in this case, Jennings did not prepare the underlying financial statements and documents that he used to form his opinion.  See Second Strike Motion Response at 4-5.  White Buffalo notes that Jennings stated during his deposition that the financial statements he used were from an accounting system and, thus, provided a reasonable factual basis for his opinion.  See Second Strike Motion Response at 5 (citing Jennings Depo. at 154:9-18)(Jennings)).  White Buffalo asserts that Jennings further testified that the financial statements he used "are of the same nature as documents typically used in his industry to conduct a business valuation analysis like he performed in this matter."  Second Strike Motion Response at 5 (citing Jennings Depo. at 233:3-13)(Jennings)).  Further, White Buffalo notes that Jennings testified that a forensic evaluation is not necessary in this case, because

nothing has led him to believe the financial documents are inaccurate.  See Second Strike Motion Response at 5 (citing Jennings Depo. at 229:14-234:16)(Jennings)).

Next, White Buffalo addresses the inter- vs. intracompany error by arguing that such error does not establish the documents were not prepared in accordance with GAAP.  See Second Strike Motion Response at 6.  White Buffalo further asserts that, even if the financial records provided to Jennings are inaccurate, Jennings' opinions remain reliable.  See Second Strike Motion Response at 7.  White Buffalo argues instead that such inaccuracy would be subject to cross-examination and fall within the factfinder's purview.  See Second Strike Motion Response at 7.

### 7.   Second Strike Motion Reply.

In reply, the Second Strike Motion Defendants argue that there must be a reasonable link between the information Jennings received, the procedures he used, and the conclusions he reached, and that such a link is missing here.  See Reply to White Buffalo Environmental Inc.'s Response to Second Motion to Strike Testimony of Jeremy Jennings at 3, filed on January 13, 2013 (Doc. 132)("Second Strike Motion Reply")(citing Tassin v. Sears, Roebuck & Co., 946 F. Supp. 1241, 1248 (M.D. La. 1996)(Vance, J.)).  The Second Strike Motion Defendants argue that the potential for misleading the jury is significant, because Jennings' use of the financial statements creates an impression that such statements were reliable, even though White Buffalo has not demonstrated that the underlying date is reliable. See Second Strike Motion Reply at 5.  Accordingly, the Second Strike Motion Defendants reiterate their request that the Court exclude Jennings' testimony.  See Second Strike Motion Reply at 5.

### 8.   Second Strike Motion Hearing.

During the Second Strike Motion Hearing held on January 17, 2023, the Second Strike Motion Defendants clarified that, under rule 702(b), Jennings' methodology is not based on

sufficient facts or data.  See Transcript of Hearing at 8:9-16 (taken Jan. 17, 2023)("January 17 Tr.")(Newell).[5]  The Second Strike Motion Defendants argued that White Buffalo has the burden of demonstrating that the data on which Jennings relies is reliable and that White Buffalo has not met its burden.  See January 17 Tr. at 10:1-12 (Newell).  The Second Strike Motion Defendants argued that the Court should review the underlying data and determine whether it is sufficient to provide reliability.  See January 17 Tr. at 16:2-6 (Newell).  In response, White Buffalo argued that the financial statements provide Jennings a reliable basis to form his opinion, because, as Jennings testified in the Jennings Depo., accounting software prepared the statements. See January 17 Tr. at 17:8-15 (Nixon).

The Court denied the Second Strike Motion.  See January 17 Tr. at 24:2 (Court).  The Court stated that no evidence suggests that the balance sheets and financial statements which Jennings uses are not sufficient to provide a valuation for the company.  See January 17 Tr. at 24:3-5 (Court). Further, the Court stated that rule 702's reliability requirement goes to whether the principles and methodology are reliable and reliably applied, and that the Second Strike Motion Defendants do not appear to dispute whether Jennings used reliable principles and methods, and applied those in a reliable manner consistent with industry standards.  See January 17 Tr. at 24:11-16 (Court). Finally, the Court stated that the financial statements do not need to be in accordance with GAAP. See January 17 Tr. at 24:21-25 (Court).

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert v. Merrell Dow</u>

---

[5]The Court's citations to the transcript of the January 17 hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011) (Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

### 1.   **Rule 702.**

Rule 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> **(b)** the testimony is based on sufficient facts or data;

> **(c)** the testimony is the product of reliable principles and methods; and

> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (bold in original).[6] Rule 702 thus requires the trial court to "determine whether

---

[6]Rule 702's most prominent hurdle is the sufficiency of basis. Yet the judiciary's uncomfortableness with analyzing an opinion's basis can be seen in the conflict in the cases. The current conflict is whether the questions of sufficiency of basis, and of application of principles and methods, are matters of weight or admissibility. Compare David E. Bernstein & Eric G. Lasker, Defending Daubert: It's Time to Amend Federal Rule of Evidence 702, 57 Wm. & Mary

L. Rev. 1, 32 (2015)("Bernstein & Lasker")("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, <u>Daubert</u> and Rule 702 mandate the exclusion of that unreliable opinion testimony." (quoting <u>Ruggiero v. Warner-Lambert Co.</u>, 424 F.3d 249, 255 (2d Cir. 2005)), <u>with</u> Bernstein & Lasker, <u>supra</u>, at 33 ("[T]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (quoting <u>Milward v. Acuity Specialty Prods. Grp</u>. 639 F.3d 11, 22 (1st Cir. 2011)).  There should not be a conflict.  Rule 702 states that these are questions of admissibility.  Yet many courts treat them as questions of weight.  <u>See</u>, <u>e.g.</u>, Bernstein & Lasker, <u>supra</u>, at 33 (citing several Courts of Appeals that instruct district courts to consider the sufficiency of basis and/or application of the methodology as questions of weight).

What is most interesting is what the divergence from Supreme Court precedent and rule 702 suggest.  The divergence suggests that <u>Daubert</u> and rule 702 are too academic.  <u>Daubert</u> and rule 702 write better than they work in the courtroom and in practice.  Lower courts continue -- rightfully so -- to be uncomfortable with deciding these issues with the Sixth and Seventh Amendments to the Constitution of the United States protecting the right to jury trials in civil and criminal cases.  <u>Cf.</u> Bernstein & Lasker, <u>supra</u>, at 33 ("[C]ourts have held that '[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.'" (quoting <u>Manpower, Inc. v. Ins. of Pa.</u>, 732 F.3d 796, 806 (7th Cir. 2013)); Ronald J. Allen, Esfand Fafisi, <u>Daubert and its Discontents</u>, Brooklyn L.R., 131, 147 (2010)(describing an argument for <u>Daubert</u>'s unconstitutionality under the Seventh Amendment).

The Court is concerned that the federal courts will overact to the wayward opinions that have created a split whether sufficiency of basis and application of methods is for the court or goes to the evidence's weight.  The Court is concerned that the federal courts are going in the direction of new rules.  There is thus a built-in institutional bias towards more rules and amendments.  The Judicial Conference runs the federal judiciary through committees.  <u>See</u> <u>About the Judicial Conference</u>, United States Courts, https://www.uscourts.gov/about-federal-courts/governance-judicial-conference/about-judicial-conference (last visited March 21, 2023)("The Conference operates through a network of committees . . . ").  The Judicial Conference has a Standing Committee on Rules, which comprises five Advisory Committees: (i) Civil Procedure; (ii) Criminal Procedure; (iii) Evidence; (iv) Bankruptcy; and (v) Appellate.  <u>See</u> <u>How the Rulemaking Process Works</u>, United States Courts, https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works (last visited March 21, 2023).  Each of these advisory committees has a reporter, almost always a prominent professor.  <u>See</u> <u>Overview for the Bench, Bar, and Public</u>, United States Courts, https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works/overview-bench-bar-and-public (last visited March 21, 2023).  The reporter position is more prestigious if the reporter can get new rules promulgated.  They have to justify their existence.  There is thus a very smart, likeable, and well-liked person putting pressure on the committee to amend the rules.  While judges are more conservative about promulgating new rules, they too often succumb to the reporter's pressure.  The result is that the federal judiciary and the bar gets a host of new rules almost every year.  The development of new rules burdens the federal judiciary and the bar -- all of which are overworked -- with mandatory changes each year, often constituting little more than stylistic

the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702 Advisory Committee's Note to 1972 Proposed Rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").  An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."  LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.[7]

---

changes.  Everyone has to get new rule books every year.  The burden of new rules often does not justify the changes' meager benefits.

[7]The Court clips experts' wings all the time.  See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150, 1204 (D.N.M. 2016)(Browning, J.)(precluding an expert from discussing class certification requirements, but allowing the expert to testify to information about royalty instruments); United States v. Rodriguez, 125 F. Supp. 3d 1216, 1255-56 (D.N.M. 2015)(Browning, J.)(permitting an expert to describe a cartel's structure and organization, and to explain drug running, but not admitting the expert's testimony opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. 602, 619 (D.N.M. 2012)(Browning, J.) (precluding a treating physician from testifying about a party's PTSD diagnosis, opinions about the causes for a party's symptoms, or a party's prognosis).  Attorneys ask experts to do too much, and experts try to do too much.  The experts are being paid; they are trying to be helpful to the attorney.  Cf. Mark I. Bernstein, Jury Evaluation of Expert Testimony Under the Federal Rules, Drexel L. Rev. 239, 268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship, competency, and honesty.  Because experts are partisan witnesses paid by a party, there is an inevitable danger of bias.").  The experts will often do anything.  They toss statements into their reports to be helpful.  Too many attorneys release the report as written -- without editing and without trimming.  This failure to edit and to trim creates unnecessary litigation.  Many expert reports contain statements that the proponent attorney does not need or even want.  The reports draw Daubert motions or rule 702 challenges.  The proponent is then forced to defend the statements that he or she does not even need or want.

See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by 'knowledge, skill, experience, training, or education' and . . . the 'expert' . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(quoting Fed. R. Evid. 702). See United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *20 (D.N.M. November 19, 2014)(Browning, J.)("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert's] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1245 (D.N.M. 2012)(Browning, J.)(determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").  "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness."  United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)).  "The Tenth Circuit may draw this distinction because, generally, it is

the jury's exclusive function to make credibility determinations . . . whereas a court makes a

pretrial determination of the constitutional voluntariness of a statement."   United States v.

Ganadonegro, 805 F. Supp. 2d at 1214 (citing United States v. Adams, 271 F.3d 1236, 1245 (10th

Cir. 2001)).

      2.      **The Standard in Daubert.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an

expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of

the case, i.e., whether it is helpful to the trier of fact.   See Daubert, 509 U.S. at 594-95;

Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649 BB/LAM, at *2 (D.N.M. July

18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).[8]   The

---

[8]The current law -- and its trajectory -- cast serious shadows over using expensive experts. This problem is particularly true in cases involving jury trials.  It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes.

    Lawyers and appellate courts overemphasize the importance of experts, and distrust juries. See Sanja Kutnjak Ivkovic & Valerie P. Hans, Jurors' Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 442 (2003)("One key assumption underlying the Daubert line of cases is that jurors might be duped by a persuasive but untrustworthy expert who testifies about matters that are not based on sound scientific principles or data.").

> After all, if one is coming from a position of ignorance, the person who holds the key to that certain body of knowledge is something of a savior.  The danger for the legal system is that this empowerment of the expert witness will result in undue deference to his or her opinion.

Elaine E. Sutherland, Undue Deference to Experts Syndrome?, 16 Ind. Int'l & Comp. L. Rev. 375, 382 (2006).

    Appellate judges often do not have extensive or any trial experience, particularly as Presidents want to rule from the grave, and appoint younger and younger appellate judges, who often -- because of their years -- have not spent a lot of time trying cases in the courtroom before juries.   Academics, corporate lawyers, general counsel, and appellate judges -- without considerable courtroom experience -- think that experts easily will mislead juries.  Yet, the Court talks regularly to juries after jury trials, and the Court listens to trial lawyers talking to juries after

Supreme Court articulated in Daubert a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.[9]   See Daubert, 509 U.S. at 594-95.   The Court also is to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was

---

jury trials.  Juries often expressly state that they disregarded the parties' experts.  The Court often hears comments like the "expert was arrogant and/or incomprehensible."

Part of the problem is that academics and, often, appellate jurists do not appreciate or understand modern American jurors.  Jurors have become very independent, and do not take direction well or easily from anyone -- the judge, lawyers, or experts.  The days of dressing up for court in coats and ties, and doing what the judge tells them to do are fading.  Jurors question everything.  If the Court tells them to go in one door, they want to use another.  Whereas jurors used to compliment the Court's jury instructions as giving a roadmap to the jurors' decisions, jurors now criticize even the uniform or pattern jury instructions.  Modern American jurors do not like to think that they are being told what to do.  And they certainly do not like experts telling them what to do; modern American jurors do not like the idea of "experts" who are smarter than they are.

At the same time that modern American jurors are showing more independence, paternalistic Daubert hearings have proliferated.  This phenomenon raises many concerns.  One concern is the sheer prevalence of Daubert motions.  Cf. Cynthia Lynne Pike, The Impact of Revised MRE 702 and 703 in Response to Daubert, 52 Wayne L. Rev. 285, 301 (2006)(describing the effects of a state-specific rule resembling rule 702 and stating: "One of the more important tactical strategies in dealing with the court's role as gatekeeper under the new MRE 702 is the use of motions in limine and other pretrial evidentiary hearings.").   Motions to dismiss, class certification motions, and motions for summary judgment, sentencings, competency hearings -- in addition to testimony -- require Daubert hearings.  The costs of Daubert motions, to the court and the parties, is staggering.  The time-consuming nature of Daubert motions is overwhelming.

[9]Federal courts are obsessed with reliability problems.  This idea pops up several places and in several ways, creating multiple grounds upon which the court has the power to exclude the expert.  See Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 27 (noting that courts treat the "assist the trier of fact" requirement for expert testimony as a relevancy requirement and stating that rule 401 already requires evidence to be relevant).

reached for the purposes of litigation or as the result of independent studies; or whether it unduly

relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3

(citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The United States Court of Appeals

for the Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d

878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific
> testimony or evidence is not only relevant, but reliable."  [Bitler v. A.O. Smith
> Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at
> 589 . . .).  This obligation involves a two-part inquiry.  Id.  "[A] district court must
> [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the
> knowledge and experience of his [or her] discipline.'"  Id.  (quoting Daubert, 509
> U.S. at 592 . . .).  In making this determination, the district court must decide
> "whether the reasoning or methodology underlying the testimony is scientifically
> valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district court
> must further inquire into whether proposed testimony is sufficiently "relevant to the
> task at hand."  Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (second, third, and fourth alterations and

second and fourth ellipses in Norris v. Baxter Healthcare Corp. but not in Bitler v. A.O. Smith

Corp.).  "The second inquiry is related to the first.  Under the relevance prong of the Daubert

analysis, the court must ensure that the proposed expert testimony logically advances a material

aspect of the case . . . .  The evidence must have a valid scientific connection to the disputed facts

in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell

Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand); Daubert, 509 U.S. at 591).  If

the expert's proffered testimony fails on the first prong, the court does not reach the second prong.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v. Carmichael, 526

U.S. 137 (1999), the Supreme Court expanded the rules under Daubert to non-scientific expert

testimony.  See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's

general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only

to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (no citation given for quotation)).   The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects *Daubert's* description of the Rule 702 inquiry as a flexible one.   [Daubert, ]509 U.S., at 594 . . . .   *Daubert* makes clear that the factors it mentions do not constitute a "definitive checklist or test." *Id.*, at 593 . . . .   And *Daubert* adds that the gatekeeping inquiry must be tied to the facts of a particular case.   *Id.*, at 591 . . . (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (C.A.3 1985)).

Kumho Tire Co. v. Carmichael, 526 U.S. at 150.

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. September 26, 2006) (Browning, J.)(citing Daubert, 509 U.S. at 595).   "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . [and the] "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.""" Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC, 2006 WL 4060665, at *11 (quoting Dodge v. Cotter Corp., 328 F.3d at 1222 (quoting Gen. Elec. Corp. v. Joiner, 522 U.S. 136, 146 (1997))(alterations in Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC, but not in Dodge v. Cotter Corp.).   The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.   See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.   The Tenth Circuit notes in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under *Daubert*, and because, in light of that discretion, there is not an

extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the *Daubert* manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. *See McEwen v. City of Norman, Okla.*, 926 F.2d [1539,] 1553-54 [(10th Cir. 1991)](discussing appellate review for an abuse of discretion). Thus, when coupled with this deferential standard of review, *Daubert's* effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1206. The United States Court of Appeals for the

Ninth Circuit notes in Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (D.N.M.

December 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123

(10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective

tissue disease is an untested hypothesis. At worst, the link has been tested and found to be

untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence

in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)

(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [which the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.    Necessity of Evaluating an Issue Under Daubert.

The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the Frye[10] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less

---

[10]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. at 1014.

likely to be challenged than those that are novel, and they are more handily defended."  Daubert,

509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status

of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under

Federal Rule of Evidence 201."  Daubert, 509 U.S. at 593 n.11.  "[W]hen experts employ

established methods in their usual manner, a district court need not take issue under *Daubert*;

however, where established methods are employed in new ways, a district court may require

further indications of reliability."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780

(10th Cir. 2009).  Whether courts have accepted theories underlying an expert's opinion is a

relevant consideration in determining whether expert testimony is reliable.  See Att'y Gen. of Okla.

v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar

with the PCR methodology,[11] and in fact some courts have indicated their acceptance of it.").[12]

---

[11]PCR, a "[p]olymerase chain reaction," Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780, is a widely used method for copying DNA segments.  Polymerase Chain Reaction, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited March 21, 2023).

[12]Much of the focus of current debate about experts is on forensic evidence, which comes in many forms.  The challenge to forensic evidence comes from two areas: (i) the federal courts; and (ii) the scientific community.  The reports of the National Academies of Science and the President's Council of Advisors on Science and Technology ("PCAST") raise challenges to the reliability of forensic methods.  See Executive Office of the President President's Council of Advisors on Science and Technology, Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Sept. 2016)("Ensuring Scientific Validity"); Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, Strengthening Forensics Science in the United States: A Path Forward (July 2009)("Strengthening Forensic Science").  There is increasing skepticism of the legal profession's most cherished evidence, including fingerprints, DNA, firearms, and breath tests. See, e.g., Ensuring Scientific Validity, at 67-110; Strengthening Forensic Science, at 42-48.

The Court is concerned that the federal judiciary is moving toward a freestanding rule on forensic evidence.  The Court is not a big fan of addressing the topic of forensic evidence through rulemaking.  No rule, procedures manual, or note is needed to tell judges that there is no certainty with forensic opinions.  There is also no reasonable degree of certainty.  These opinions are now considered overstated: in the old days -- like last week -- attorneys would routinely ask: "Doctor,

# ANALYSIS

The Court denies the First Strike Motion and the Second Strike Motion and concludes that Jennings may testify. Both motions argue that the Court must exclude Jennings from testifying under rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

in your opinion, to a reasonable degree of certainty, that the plaintiff's appendix was on the left side of the body?"

The nation does not need another rule. An examination of Article VII -- Opinions and Expert Testimony -- shows six rules: (i) rule 701 -- Opinion Testimony by Lay Witnesses; (ii) rule 702 -- Testimony by Expert Witnesses; (iii) rule 703 -- Bases of an Expert's Opinion Testimony; (iv) rule 704 -- Opinion on an Ultimate Issue; (v) rule 705 -- Disclosing the Facts or Data Underlying an Expert's Opinion; (vi) rule 706 -- Court-Appointed Expert Witnesses (a bad idea in about all cases). See Fed. R. Evid. 701-06. If the reporter would drop rule 706, perhaps there would be room for a rule pertaining to forensic evidence.

The Court is concerned with what a new rule would look like. The judiciary could make its point in a committee note, but without a new rule, there is no need for a new note. The PCAST report does not propose a change to the Evidence Rules. Rather, PCAST proposes a best procedures manual. See President's Council of Advisors on Science and Technology, supra, at 145. It would be better if legal leaders do like Duke University School of Law has done for class actions and the Sedona Conference has done for electronic discovery. See Class-Action Settlement Conference, Duke Law, https://law.duke.edu/judicialstudies/conferences/oct2016/ (last visited March 21, 2023); The Sedona Conference Working Group Series, The Sedona Conference, https://thesedonaconference.org/wgs (last visited March 21, 2023). The Court believes that, rather than a new rule or note, the Court believes that a best practices manual -- prepared by professional leaders who come together to write -- and not the judiciary -- would be the better approach. The Court expects several difficulties with a new rule. The first difficulty with any rule on forensic evidence will be determining to whom it should apply. A new rule would presumably apply to forensic witnesses' testimony. Such witnesses include people testifying about evidence about through scientific means, by comparing patterns, or by "experimental or scientific analysis." Evidence, Black's Law Dictionary (10th ed. 2014). After the courts and the bar have identified the universe of experts to whom the rule applies or the best practices apply, the new rules' requirements must be determined. An expert must already satisfy all of rule 702's requirements. Under a new rule, the expert also will need to satisfy all the new requirements. With more handles, the chances of exclusion or limiting are enhanced. Rule 702's requirements, however, are enough, and the law should not require more.

(b)      the testimony is based on sufficient facts or data;

(c)      the testimony is the product of reliable principles and methods, and

(d)      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Both the First Strike Motion Defendants and the Second Strike Motion Defendants argue that, under rule 702(b), the Court must exclude Jennings' testimony, because he does not base his opinions upon sufficient facts or data.   See First Strike Motion at 2; January 17 Tr. at 8:9-16 (Newell).   The First Strike Motion Defendants argue, additionally that, under rule 702(c) and 702(d), Jennings' opinion is not the product of reliable principles and methods, and that Jennings fails to reliably apply the principles and methods to this case's facts.   See First Strike Motion at 2.   For the reasons stated below, the Court denies both Motions and concludes that Jennings may testify at trial.

## I.      THE COURT REJECTS THE FIRST AND SECOND STRIKE MOTIONS' 702(b) ARGUMENTS, BECAUSE JENNINGS BASES HIS OPINIONS ON SUFFICIENT FACTS AND DATA.

An expert witness must base his or her testimony on sufficient facts and data.   See Fed. R. Evid. 702(b).   The First Strike Motion Defendants and Second Strike Motion Defendants each argue that Jennings has not based his opinions on sufficient facts and data.   See First Strike Motion at 2; January 17 Tr. at 8:9-16 (Newell).   Likewise, both the First Strike Motion Defendants and the Second Strike Motion Defendants take issue with the financial documents that White Buffalo has supplied Jennings.   See First Strike Motion at 8-9; Second Strike Motion at 2.   Because each Motion presents different arguments regarding the financial documents, the Court addresses each Motion in turn.

A.   **THE COURT REJECTS THE FIRST STRIKE MOTION'S ARGUMENT THAT JENNINGS BASED HIS OPINIONS ON INSUFFICIENT FACTS AND DATA.**

The First Strike Motion's argument that Jennings relies on insufficient facts and data is not well taken, because all six reasons which the First Strike Motion Defendants present in support of their argument go to the weight and credibility of Jennings' report.  Specifically, the First Strike Motion Defendants argue that the Court should exclude Jennings' testimony under rule 702(b), because: (i) Jennings has not conducted independent factual research; (ii) Jennings relies on unaudited financial statements; (iii) Jennings relies on six months of financial data; (iv) the oil-and-gas market's volatility render any valuation of future profits impossible or improbable; (v) White Buffalo's reduction in value resulted from White Buffalo's poor financial management; and (vi) Jennings' arithmetic is flawed.  See First Strike Motion at 8-9

First, the Federal Rules of Evidence do not require an expert witness to conduct an independent factual investigation.  See Fed. R. Evid. 703.  Instead, rule 703 states: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed . . . ."  Fed. R. Evid. 703 (emphasis added).  In this case, White Buffalo made Jennings aware of facts and data pertinent to this case in the form of: (i) monthly balance sheets; (ii) monthly income statements; (iii) income statements; (iv) invoice register reports; and (v) purchase documents.  See Jennings Report at 46.  Thus, Jennings adequately may base his opinions off these financial documents.

Second, the First Strike Motion Defendants argue that "unaudited financial information is not a proper and reliable basis for [Jennings'] expert opinion."  First Strike Motion at 5.  The First Strike Motion Defendants present, however, no evidence, case law, or rule indicating that the marking "Unaudited -- For Management Purposes Only" renders the data within the documents

insufficient.  First Strike Motion Response at 7-8.  See First Strike Motion at 5.  Instead, the unaudited financial statements provide the Defendants an opportunity to cross-examine Jennings on the issue.  Third, Jennings' reliance on only six months of financial data stems from White Buffalo's short operating period.  See First Strike Motion Response at 10.  To hold that six months of financial data is insufficient would place significant burden on start-up companies that exist for only a short time before suffering harm.

Fourth, the oil-and-gas market's volatility does not render the financial data of a company insufficient.  Instead, the volatility provides an opportunity for the Defendants to hire an expert witness with a differing opinion and present this opinion to the jury, which is what the Defendants have done in this case.  See First Strike Motion at 2.  It is the jury's role to hear each expert witness' opinion and determine who is more credible.  See Chesapeake & O. Ry. Co. v. Martin, 283 U.S. 209, 216 (1931)("We recognize the general rule . . . that the question of the credibility of witnesses is one for the jury alone . . . .");  United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993)(concluding that a witness's credibility is an inappropriate for expert testimony, in part, because "it is not helpful to the jury, which can make its own determination of credibility");  Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instructions (Criminal) 1.08, at 16 (2021 ed.)(Credibility of Witnesses)("You are the sole judges of the credibility or 'believability' of each witness and the weight to be given to the witness's testimony.").

Fifth, the Defendants' argument that White Buffalo's reduction in value is White Buffalo's fault provides similarly an opportunity for cross-examination.  Whether White Buffalo has contributed to its own reduction in value does not render its financial data insufficient.  The Defendants appear to make a contributory negligence argument, which is not appropriate for a

Daubert motion.   Sixth, any arithmetical discrepancies do not render the underlying data insufficient.   Instead, as stated with the previous arguments, the Defendants may cross-examine Jennings and allow the jury to decide whether such errors undermine his opinion's credibility.

Last, the Court disagrees with White Buffalo's argument that the First Strike Motion was filed prematurely.   Because of the strategic nature of depositions, nothing requires that an expert must be deposed before a party may file a Daubert motion.   Instead, a Daubert motion is appropriate whenever a party wants to file one.   Accordingly, the Court concludes that none of the First Strike Motion Defendants' arguments indicate that Jennings relied on insufficient facts or data.

**B.   THE COURT DENIES THE SECOND STRIKE MOTION, BECAUSE THAT THE DATA JENNINGS RELIED ON WAS NOT PREPARED IN ACCORDANCE WITH GAAP DOES NOT SUGGEST THE DATA IS INSUFFICIENT.**

The Second Strike Motion's argument that Jennings relies on insufficient facts or data is unpersuasive.   First, Jennings' use of financial data that may not have been prepared in accordance with GAAP does not imply that he used insufficient facts or data.   The Second Strike Motion Defendants argue that Jennings relies on insufficient facts and data, because the financial documents he uses are not prepared in accordance with GAAP.   See Second Strike Motion at 2. The Second Strike Motion Defendants point to Jennings' deposition, in which he states that accounting professionals use GAAP to help promote reliability.   See Second Strike Motion at 2-3 (citing Jennings Depo. at 146:4-147:2)(Jennings)).   The Second Strike Motion Defendants cite no evidence, however, that requires business valuation experts to use only financial data prepared in accordance with GAAP.   Instead, that the underlying data may not have been prepared in accordance with GAAP is another issue which the Defendants may attack on cross-examination.

Thus, that Jennings relies on data that may not have been prepared in accordance with GAAP does not suggest he based his opinion off insufficient facts or data.

Second, Jennings' misinterpretation of "intra" and "inter" does not render the underlying financial data insufficient.  As discussed above, Jennings is not obligated to conduct independent research or verify the accuracy of the information provided to him.  Thus, that Jennings accepted the information given to him without verifying it, even if he ultimately misinterpreted it, does not render the underlying information insufficient.  Accordingly, the Court will not exclude Jennings' testimony on this basis and will deny the Second Strike Motion.

II.     **THE COURT REJECTS THE FIRST STRIKE MOTION'S 702(c) AND 702(d) ARGUMENTS, BECAUSE JENNINGS USES RELIABLE PRINCIPLES AND METHODS, AND RELIABLY HAS APPLIED THESE PRINCIPLES AND <u>METHODS TO THIS CASE'S FACTS.</u>**

In addition to their argument that Jennings does not base his opinions on sufficient facts and data, the First Strike Motion Defendants argue that Jennings' opinions are not the product of reliable principles and methods, and that Jennings does not apply reliably the principles and methods to the case's facts.  <u>See</u> First Strike Motion at 2.  The First Strike Motion Defendants present the Miller Report to support their arguments.  <u>See</u> First Strike Motion at 2 (citing Miller Report at 1-7).  In reviewing the Jennings Report under <u>Daubert</u>, the Court must focus generally on "principles and methodologies, and not on the conclusions generated."  <u>Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC</u>, 2006 WL 4060665, at *11 (citing <u>Daubert</u>, 509 U.S. at 595).  "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . [and the] "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."'"  <u>Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC</u>, 2006 WL 4060665, at *11 (quoting <u>Dodge v. Cotter Corp.</u>, 328 F.3d at 1222).  The proponent of the

expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case, and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.

White Buffalo has established that Jennings' testimony is reliable and helpful to the trier of fact, and the First Strike Motion Defendants' arguments do not indicate sufficiently otherwise. Jennings testified at his deposition that he performed his valuation "in accordance with IACPA [sic[13]] standards on business valuation."  Jennings Depo. at 147:21-23.  Further, Jennings testified that he has valued several businesses in the litigation context, one of which operated in the oil-and-gas industry.  See Jennings Depo. at 13:1-14:16.  Last, Jennings testified that he previously has testified as an expert witness in several of these cases.  See Jennings Depo. at 15:1-21 (Jennings).  The Defendants do not present the Court with an affidavit or testimony from another business valuation expert that disputes Jennings' testimony.  Instead, the Defendants rely on the Miller Report to dispute Jennings' conclusions.  See First Strike Motion at 4.  In the Miller Report, Miller points to flaws in Jennings' methodologies and factual assumptions or omissions.  See Miller Report at 3-4.  As discussed previously, that Jennings made erroneous assumptions or ignored relevant facts constitutes an attack on the weight and credibility of Jennings' testimony. Thus, this section of the Miller Report provides ammunition for the Defendants to cross-examine, but does not require that the Court exclude Jennings' testimony entirely.

---

[13]The Court believes "IACPA" is a typo in the Jennings Depo. transcript, and the standard to which Jennings refers is the AICPA, or the Association of International Certified Professional Accountants business valuation standard.  See generally Business Valuation, AICPA, https://us.aicpa.org/interestareas/forensicandvaluation/resources/businessvaluation (last visited March 13, 2023).

Moving to Miller's assessment of Jennings' methodologies, each of Miller's critiques is an opinion regarding Jennings' approach to White Buffalo's valuation.  See Miller Report at 3-4. Nowhere does Miller state that Jennings' methodologies are contrary to the industry standard. Thus, Miller's assessment is simply one expert criticizing another expert's opinion.  As White Buffalo states, this dispute amounts to a "battle of the experts," December 8 Tr. at 14:2-7 (Nixon), in which both experts are qualified, and the jury must determine who is more credible. Accordingly, the Court denies the First Strike Motion, because Jennings' principles and methods are reliable, and he reliably applied those principles and methods to the facts of this case.

**IT IS ORDERED** that Defendants Hungry Horse, LLC, Natalie Gladden, Heriberto "Eddie" Gaytan, Jr., Dakoatah Montanez, and Lindsay Salgado's Motion to Preclude Testimony of Expert Witness Under the *Daubert* Standard, filed September 29, 2022 (Doc. 104), is denied; and (ii) Gladden and Montanez' Second Motion to Strike Testimony of Jeremy Jennings, filed December 15, 2022 (Doc. 127), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Luis E. Robles
Marcus J. Rael, Jr.
Jessica Lynn Nixon
Samuel C. DeFillippo
Robles, Rael and Anaya, P.C.
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Dawson Andrew Brotemarkle
Pamela S. Anderson
Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.
Tulsa, Oklahoma

-- and --

Michael V. Allison
The Allison Law Firm P.C.
Albuquerque, New Mexico

>*Attorneys for Defendants Hungry Horse, LLC, Lindsay Salgado, Kathy Rivera, and Heriberto "Eddie" Gaytan Jr.*

Michael Truett Newell
Christan Nichole Quiroz
Newell Valencia Law Firm, LLC
Lovington, New Mexico

>*Attorneys for Defendants Natalie Gladden and Dakoatah Montanez*